**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Allen Siegfried, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING IN PART** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | **AND STAYING ACTION** |
| | ) | |
| Bureau of Indian Affairs and | ) | Case No. 1:05-cv-055 |
| United States of America, | ) | |
| | ) | |
| Defendants. | ) | |

## I.     BACKGROUND

This action arises out of injuries sustained by plaintiff following the high-speed pursuit of

an alleged car thief.   Plaintiff, Allen Siegfried ("Siegfried"), is a tribal law enforcement officer

employed by the Standing Rock Indian Reservation.

On the morning of April 18, 2003, Siegfried was riding with fellow tribal law enforcement

officer Thomas DeLong ("DeLong") in DeLong's patrol unit when they were advised by the Fort

Yates Police Department that a pickup truck been had stolen at Shields, North Dakota.  Shields is

located on the western edge of the Standing Rock  Reservation, just outside the reservation's

boundaries.  Siegfried and DeLong then proceeded toward Shields and passed a pickup meeting the

description of the stolen vehicle.  They tried to stop the pickup truck near the junction of Highways

24 and 1806, but were unsuccessful.   The pickup truck fled north on Highway1806 toward

Cannonball, North Dakota, at a high rate of speed.  Cannonball is located on the reservation.

Siegfried and DeLong pursued the stolen pickup truck at high rates of speed in and around

the community of Cannonball.  Eventually, the pickup went off-road down a big hill toward the

Missouri River.  Unable to pursue further in their patrol unit, Siegfried and DeLong  stopped and

were soon joined by Bureau of Indian Affairs ("BIA") Special Agent David Lawrence ("Lawrence"),
who had been dispatched to assist after the tribal officers had reported that they were in pursuit of
the stolen pickup.

Lawrence asked Siegfried to join him in his four-wheel-drive patrol vehicle, and they
continued the pursuit, following the pickup down one embankment and up another. They were then
rejoined by DeLong when the pickup re-entered the roadway. They were also joined by tribal
officers Jeremy Hollow, Gary Sandland, and Shane Ramsey, as well as by another BIA officer,
Bryan Waukazoo.

After re-entering the roadway, the pickup broadsided Lawrence's patrol vehicle, striking it
on the passenger side. After receiving radio confirmation that Lawrence's vehicle had been struck,
BIA Chief Azure instructed Lawrence to attempt to run the pickup off the road before it re-entered
Cannonball. Lawrence pulled his vehicle in front of the pickup and attempted a rolling stop, but
his maneuver was unsuccessful. The pickup collided with the rear of Lawrence's vehicle, striking
it a second time, changed direction and the chase continued.

Finally, Lawrence was able to again pull his vehicle in front of the pickup and he attempted
another rolling stop. This time the pickup struck the rear of Lawrence's vehicle extremely hard
causing the injuries to Siegfried that are the now the subject of this action. Immediately following,
what was now the third collision with the Lawrence vehicle, the pickup collided with the patrol unit
driven by DeLong, who had come up from the rear. Lawrence then backed up, pinning the pickup
to Delong's vehicle and ending the chase.

Siegfried was transported to Indian Health Services by Lawrence for medical attention after
complaining of back pain. The driver of the pickup, who was then identified as Curtis Feather, an

Indian, was taken into tribal custody and charged in tribal court with reckless driving, speeding, evading, vehicle theft, hit and run, and driving under the influence.  The record does not indicate what happened to the tribal charges.  However, within a matter of days, Feather was indicted by a federal grand jury for federal offenses arising out of the chase, but not for any charges arising out of the theft of the pickup.  Feather was taken into federal custody on April 24, 2003, and later pled guilty to one count of resisting a federal officer, two counts of assault with a dangerous weapon, and one count of damage to federal property in excess of $1,000.[1]  Because of his prior criminal record, Feather was sentenced as a career offender  and received a sentence of 180 months.  An appeal of his sentence to the Eighth Circuit Court of Appeals was unsuccessful.[2]

On October 27, 2003, Siegfried filed a $500,000 administrative claim with the BIA pursuant to the Federal Tort Claims Act ("FTCA").  The crux of the claim was that the BIA was negligent for failing to maintain its vehicle in a safe manner.  According to Siegfried, the seatbelt on the passenger side of Lawrence's vehicle failed when the pickup collided with Lawrence's vehicle for the third and final time - the second time from the rear.  The Department of the Interior returned his claim on June 9, 2004, for failure to complete the appropriate paperwork.

Siegfried re-filed his administrative claim on August 19, 2004, this time seeking $750,000 in damages.  He described the basis for his claim, in relevant part, as follows:

> A pursuit started with a stolen pickup driven by Curtis Feather, in which I was a passenger with Officer Thomas Delong first, and then was a passenger with Special

---

[1]  The parties did not submit any information regarding the federal charges and their disposition.  The court takes judicial notice of the  acts pertaining to these matters, which come from the court's own records in United States v. Feather, C1-03-022 (D.N.D. 2003).

As noted, the record is silent regarding the disposition of the tribal charges.  However, given the short time between the initial arrest and when Feather was taken into federal custody, the court suspects the tribal charges may been deferred in favor of the federal prosecution.

[2]  United States v. Feather, 369 F.3d 1035 (8th Cir. 2004).

> Agent David Lawrence in a BIA government vehicle (Blue Ford Expedition). While pursuing the stolen vehicle out of the community of Cannonball, ND, Chief James Azure gave verbal command to make contact with the stolen vehicle. We both had our seatbelts on, but SA Lawrence stated to me that I better hang on because the seatbelts didn't work. While still in pursuit on Hwy 24, SA Lawrence pulled in front of the stolen vehicle and got the stolen vehicle boxed in with other police units, when the stolen vehicle rear ended SA Lawrence's vehicle, throwing me forward and then back, for [illegible] the seatbelt didn't lock, causing me to receive my back injury.

The Department of the Interior denied the claim in a letter dated October 20, 2004, explaining it could not corroborate Siegfried's version of the incident and was unable to find any evidence to substantiate his negligence claim. No mention was made at that point about Siegfried's claim being barred because he had failed to exhaust available Federal Employee's Compensation Act remedies.

Siegfried filed the above-entitled action pursuant to the FTCA on June 9, 2005. He sets forth two theories of recovery in his complaint. First, he alleges that the BIA was negligent for failure to maintain its patrol vehicle in a safe manner. Second, he asserts that Curtis Feather, the driver of the stolen pickup truck, was not covered under a motor vehicle insurance policy and that the government, as a self-insured, is therefore obligated under N.D.C.C. § 26.1-40-15-2 to provide compensation for his damages in accordance with the State's uninsured motorist law.

On December 20, 2006, the government filed a Motion for Summary Judgment, the bases being that (1) Siegfried's claims under the FTCA are barred by the exclusive remedy provisions of the Federal Employees' Compensation Act ("FECA"), (2) the defendants are immune from suit, and (3) this court lacks subject matter jurisdiction over Siegfried's claims.

On January 17, 2007, Siegfried filed a response in opposition to the government's motion. He dismissed the notion that his involvement in the pursuit Curtis Feather entitles him to FECA coverage. In addition, he reiterated his belief of entitlement to uninsured motorist benefits from the government.

4

## II.     DISCUSSION

### A.     Possible FECA coverage precludes an FTCA action at this time

The Federal Employee's Compensation Act ("FECA") is a comprehensive worker's compensation program for federal civilian employees who are injured on the job. Like comparable state workers' compensation acts, FECA is an exclusive remedy and precludes, for example, suit under the FTCA. Lockwood Aircraft Corp. v United States, 460 U.S. 190 (1983); Pourier v. U.S., 138 F.3d 1367, 1267-68 (8th Cir. 1998).[3]

In 1968, Congress extended FECA's benefits to state and local law enforcement officers who are injured while collaborating with federal officials in the apprehension of persons committing federal crimes. The operative language is contained in 5 U.S.C. § 8191, which reads, in pertinent part, as follows:

> The benefits of this subchapter are available as provided in this subchapter to eligible law enforcement officers (referred to in this subchapter as "eligible officers") and their survivors. For the purposes of this subchapter, an eligible officer is any person who is determined by the Secretary of Labor in his discretion to have been on any given occasion--
>
>> (1) a law enforcement officer and to have been engaged on that occasion in the apprehension or attempted apprehension of any person--
>>
>>> (A) for the commission of a crime against the United States, or
>>> (B) who at that time was sought by a law enforcement authority of the United States for the commission of a crime against the United States, or

---

[3]  In Lockwood Aircraft Corp, the Supreme Court explained:
FECA's exclusive liability provision was enacted in substantially its present form in 1949. FECA Amendments of 1949, sec. 201, 63 Stat. 861 (enacting FECA § 7(b)) (currently codified at 5 U.S.C. § 8116(c)). It was designed to protect the Government from suits under statutes, such as the Federal Tort Claims Act, that had been enacted to waive the Government's sovereign immunity. In enacting this provision, Congress adopted the principal compromise-the "quid pro quo"-commonly found in workers' compensation legislation: employees are guaranteed the right to receive immediate, fixed benefits, regardless of fault and without need for litigation, but in return they lose the right to sue the Government. See H.R.Rep. No. 729, 81st Cong., 1st Sess., 14-15 (1949); S.Rep. No. 836, 81st Cong., 1st Sess., 23 (1949), U.S.Code Cong.Serv. 1949, p. 2125.
460 U.S. at 193-194.

> > (C) who at that time was sought as a material witness in a criminal
> > proceeding instituted by the United States; or
>
> (2) a law enforcement officer and to have been engaged on that occasion in
> protecting or guarding a person held for the commission of a crime against
> the United States or as a material witness in connection with such a crime;
> or
>
> (3) a law enforcement officer and to have been engaged on that occasion in
> the lawful prevention of, or lawful attempt to prevent, the commission of a
> crime against the United States;
>
> and to have been on that occasion not an employee as defined in section 8101(1), and
> to have sustained on that occasion a personal injury for which the United States
> would be required under subchapter I of this chapter to pay compensation if he had
> been on that occasion such an employee engaged in the performance of his duty.

While § 8191 does not state that FECA coverage is the exclusive remedy of local law enforcement officers relative to other possible federal remedies, this is the only reasonable construction of FECA's provisions taken as a whole.  City of Whittier v. United States Dep't of Justice, 598 F.2d 561, 563 (9th Cir. 1979); Aponte v. United States, 940 F. Supp. 898, 900-902 (E.D.N.C. 1996).

Under FECA, the Secretary of Labor has been delegated sole discretion to determine eligibility and the Secretary's decision is not subject to judicial review.  E.g., McDaniel v. United States, 970 F.2d 194, 196-197 (6th Cir. 1992); see 5 U.S.C. § 8128(b).  Consequently, this court cannot determine Siegfried's  eligibility under FECA, nor can it instruct the Secretary of Labor as to what criteria he should employ applying the language of the statute to the particular circumstances of this case.

Instead, the court is limited to determining whether there exists a substantial question regarding FECA coverage.  E.g., McDaniel v. United States, 970 F.2d at 198; Concordia v. United States Postal Service, 581 F.2d 439, 443-444 (9th Cir. 1978).  If so, then the court must afford the Secretary of Labor the opportunity to decide whether there is FECA coverage before the FTCA claim can proceed given the exclusive remedy provisions of FECA.  Id.

Turning to the facts of this case,[4] it was Siegfried and his fellow tribal law officer who first initiated the effort to apprehend the driver of the stolen pickup. And, when they did so, all of the evidence before the court points to the conclusion that it was for the purpose of enforcing tribal law, at least at that point. In particular, there is no evidence that the tribal officers were advised the driver was wanted by BIA Law Enforcement or other federal officials for federal violations. What had been reported to them was that the vehicle had been stolen in or near Shields, which is just off the reservation. And, for their purposes, it did not make difference whether the theft occurred on or off the reservation since mere possession of stolen property is a tribal offense.[5]

Later, BIA Special Agent Lawrence and another BIA officer joined the chase. To the extent it may ultimately be pertinent to the question of eligibility, the present record is devoid of any information as to what their intent was at that time they joined the chase in terms of whether they were pursuing the driver for possible federal criminal violations, whether they were intending merely to assist the tribal authorities with their apprehension of the driver on tribal charges, or whether they were assisting with knowledge that criminal acts had likely taken place and with the idea the nature of the charges, whether tribal or federal, would get sorted out. The court suspects the latter is what frequently happens given the frequently overlapping federal and tribal criminal jurisdiction and the complexity of the federal jurisdictional issues.

---

[4] It appears that most of the salient facts in this case are undisputed. However, given the amount of discretion afforded the Secretary of Labor in making the determination of eligibility, it would appear that the usual rules for summary judgment are not applicable and that the government need only demonstrate that there is a substantial question regarding FECA coverage, whether it be legal, factual, or both.

[5] Standing Rock Sioux Tribe Code of Justice § 4-604 (1994).

Regardless of what the BIA officers were actually thinking when they joined the chase, there were facts suggesting, at least the possibility, that a federal offense had been committed.[6]  Further, during the lengthy chase and prior to the collision causing the injuries that are the subject of this action, Feather committed additional criminal acts, some of which were clearly federal criminal violations, including the offense of assaulting, resisting, or impeding a federal officer and the offense of assault with a dangerous weapon.[7]  In fact, as already mentioned, Feather was later indicted on federal charges arising out of the chase, including the two-mentioned offenses and, also, the offense of committing damage to federal property in excess of $1,000.

---

[6]  Larceny, as defined by 18 U.S.C. § 661, is a federal offense, but it can only be charged when there is some nexus between the criminal acts and a special maritime or territorial jurisdiction of the United States.  At the time of the chase, the vehicle was reported as having been stolen from a residence near Shields, North Dakota, which is located just outside the boundaries of the Standing Rock Sioux Indian Reservation.  The record before the court does not indicate whether the residence was on or off the reservation, and there is nothing to indicate that the officers giving chase, and particularly the BIA officers, knew one way or the other at the time of the chase.  If the vehicle was stolen on the reservation, 18 U.S.C. § 661 clearly applies.  However, if the initial taking occurred outside the reservation, there may be some question regarding whether the suspect could be prosecuted under 18 U.S.C. § 661, given that the offense is defined as:  "Whoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any person property of another. . . ."  See Hall v. United States, 404 F.2d 1367 (10th Cir. 1949); but cf. U.S. v. Haukey, 2 Cranch C.C. 65, 26 F.Cas. 227 (C.C.D.C. 1812); U.S. v. Tolson, 1 Cranch C.C. 269, 28 F.Cas.200 (C.C.D.C. 1803).

Mere possession of stolen property is not a separately defined offense under federal law.  However, the North Dakota offense of possession of stolen property under N.D.C.C. § 12.1-23-02(3) becomes a federal offense if committed by an Indian on an Indian reservation by virtue of the provisions of 18 U.S.C. §§ 13 & 1152, but only if the victim is non-Indian - which might well have been the case, particularly if the victim (whose last name was Kraft) lived outside the reservation.

In short, there would have been grounds for considering the driver of the stolen vehicle to have been at least a suspect for having violated 18 U.S.C. § 661 and/or 18 U.S.C. §§ 13 & 1152 together with N.D.C.C. § 12.1-23-02(3).  The fact the government did not later seek an indictment for a violation of 18 U.S.C. § 661 may be indicative of the fact that the theft occurred outside the reservation.

[7]  Most of the chase took place in and near the community of Cannonball, which is located on the reservation.  Prior to the collision that caused the injury, the police reports establish that the suspect was attempting to evade the BIA officers, as well as the tribal officers, and the suspect's vehicle collided twice with Lawrence's vehicle prior to the collision that actually caused Siegfried's injuries.  Consequently, the suspect had arguably violated federal law, including the offense of Assaulting, Resisting, Opposing,  or Impeding a federal officer (18 U.S.C. §§ 111 & 1114) and Assault with a Dangerous Weapon, i.e., the use of the automobile, (18 U.S.C. §§ 113(a)(3) & 1153).

Following the incident, BIA law enforcement prepared a report listing these two offenses, as well as the federal offense of larceny, as the being the subject of their investigation. As noted above, this led to Feather's indictment on four counts of federal criminal violations arising out of the chase.

8

As applied to this case, 5 U.S.C. § 8191 provides FECA coverage for a local law enforcement officer in two possibly distinct circumstances.  The first is when the local law enforcement officer was engaged in the apprehension of a person "for the commission of a  crime against the United States . . . " under subparagraph (1)(A).  The second is when the law enforcement was engaged in the apprehension of a person "who, at that time was sought by a law enforcement authority of the United States for the commission of the crime against the United States . . ." under subparagraph (1)(B).

Siegfried's argument is that neither of these provisions apply.   In terms of subparagraph (1)(A), he argues that he was simply carrying out his responsibilities as tribal officer in seeking to apprehend the driver for possible violations of tribal law.  In terms of subparagraph (2)(A),  he argues that the BIA officers initially joined in the chase only for the purpose of assisting the tribal authorities in their apprehension of the subject, and, in any event, he was not informed that the subject was being sought for having committed a federal crime.

If the primary focus in determining FECA coverage under either (1)(A) or (1)(B) is what the local law enforcement officer's primary purpose was at the time of the apprehension efforts, then Siegfried makes credible arguments for why there may not be coverage in this case.  In fact, one very plausible construction of §8191 is that it applies only when local law enforcement officers are assisting federal officers in an apprehension of a person for federal crimes and not when the local law enforcement officers are independently  involved for local law enforcement purposes.

In response, the government argues that, if a relevant criterion for coverage is that the local law enforcement officer must have been assisting a federal officer in the apprehension effort, this is what happened according to the government, particularly when Siegfried responded to Lawrence's

request to join him in his vehicle to continue the chase.  Also, the government argues that, if a relevant criterion is that the apprehension must have been for a federal purpose, it soon became one when Feather struck Lawrence's vehicle for the first time, thereby committing the federal offense of assault on a federal officer and assault with a dangerous weapon.

The government also makes a third argument based upon a broader reading of the language of § 8191.  Essentially, the argument is that the motivations of the local law enforcement officer and the federal officials are not dispositive.  Rather, putting aside what the officers may have been intending or what may have been the initial objective, there is a sufficient basis for affording coverage if at any point there existed grounds for charging a federal offense (or for considering the subject to be a suspect in the commission of a federal offense) and the apprehension effort ended up benefitting federal authorities.

The government argues this latter approach is in keeping with what it believes to be FECA's objective of insuring that local law enforcement officers are provided with adequate coverage for personal injuries when they end up assisting federal officials, even if that was not the initial purpose. In particular, the government argues this insures coverage in situations, like perhaps this one, where both federal and local authorities have concluded that criminal acts have taken place, where some of these criminal acts could be federal violations, where federal and local law enforcement officials are cooperating in the apprehension effort, and where the actual prosecution decisions are sorted out after the fact.

Given the breadth of the relevant FECA language, and particularly subparagraph (1)(A), the government's arguments for coverage are also plausible - particularly given the broad discretion afforded the Secretary in determining eligibility.  Thus, while the court believes the Secretary would

10

be justified in deciding the coverage issue either way, the conclusion the court must reach is that this case presents a substantial question of FECA coverage.

Consequently, based on the authority previously cited, the court cannot proceed to consider Siegfried's FTCA claim until the Secretary has determined there is no FECA coverage. However, if the court dismisses the FTCA action now and the Secretary later determines there is no FECA coverage, Siegfried will be faced with a statute of limitations bar when he re-files his FTCA claim. To avoid this unfair result, the court has the inherent power to stay the FTCA action pending the Secretary's determination, particularly in situations, such as this case, when the coverage issue is not so one-sided that coverage is a foregone conclusion. E.g., McDaniel v. United States, 970 F.2d at 198; Concordia v. United States Postal Service, 581 F.2d at 443-444.[8]

**B.    Siegfried's claim for uninsured motorist benefits lacks merit**

Siegfried argues that the government should be held liable for first-party uninsured motorist benefits under North Dakota law based on the fault of the driver being chased and the fact he was uninsured. Siegfried has failed to demonstrate, however, that the federal government has agreed to pay such first-party insurance benefits, or subject itself to North Dakota law on this point. And, in the absence of such agreement or consent, the imposition of a state-law obligation to pay first-party benefits amounts to direct regulation of the federal government in violation of the Supremacy

---

[8]  There may be an issue regarding whether the nominal time period for seeking a determination of FECA coverage has passed. But, even if it has, the Secretary has the discretion to waive the time period under certain situations, including "exceptional circumstances." 5 U.S.C § 8122(d)(3). In this case, the fact that possible FECA coverage is not obvious, the complexity of the issues created by the overlapping federal/tribal jurisdictions, the difficult issues of statutory interpretation of FECA presented by this matter, the fact that the Department of Interior did not rely upon FECA coverage as one of the grounds for its administrative denial of Siegfried's claim, and the fact that the Department of Interior was immediately advised of Siegfried's injuries are all reasons for finding exceptional circumstances, and the court urges the Secretary to so conclude in the event Siegfried files a claim. Cf. Concordia v. United States Postal Service, 581 F.2d at 443-444.
    Also, given the nature of the injuries claimed by Siegfried, it clear that the FECA remedy is exclusive for all of his injuries, both physical and emotional. Aponte v. United States, 940 F. Supp. at 902.

Clause.  See, e.g., Johnson v. State of Maryland, 254 U.S. 51 (1920); see generally North Dakota v. United States, 495 U.S. 423 (1990) ("State law may run afoul of the Supremacy Clause in two distinct ways: The law may regulate the Government directly or discriminate against it, . . . or it may conflict with an affirmative command of Congress.").

Further, there is also the problem of the federal government's immunity from suit.  In this case, the only waiver relied upon by Siegfried is the FTCA.  Siegfried's claim that the federal government is required to provide him with uninsured motorist benefits,  however, is not a proper FTCA claim.  Cf. Westfield Companies. v. United States, 858 F. Supp. 658, 660-661 (W.D. Mich. 1993) (first-party no-fault benefits not recoverable under the FTCA);  Cole v. United States, 1986 WL 5805 *4 (S.D.N.Y. 1986) (same); L. Rayson & R. Longstreth, Handling Federal Tort Claims § 9.10[2].  This is because it would amount to the imposition of strict liability for the fault of a third party, and the government's consent to be sued under the FTCA is limited to actions arising out of the negligence or other wrongful act or omission of a federal employee. Id.; cf. Laird v. Nelms, 406 U.S. 797 (1972).

## III.    DECISION AND ORDER

Based on the foregoing, the government's motion for summary judgment is **GRANTED** to the extent that the court hereby **ORDERS**:

1.     The government is granted partial summary judgment of dismissal as to the claim for uninsured motorist benefits, but not final judgment because of the remaining claims.

2.     This action will be stayed for a period of sixty (60) days from the date of this order. If within sixty days Siegfried has not filed proof that he has initiated a claim for FECA benefits with the Secretary of Labor, this action will be dismissed with

prejudice, but without costs to either party given the novelty of the issues involved and the closeness of the case. Also, the court will dismiss the action with prejudice and without costs if prior to the expiration of sixty days, Siegfried notifies the court in writing that he has decided not to pursue a FECA claim.

3.      If within sixty days Siegfried files proof that he has initiated a FECA claim, the case shall automatically be further stayed for so long as Siegfried is diligently pursuing his FECA remedies. Also, in that event, Siegfried is required to notify the court of any final decision by the Secretary of Labor on his FECA claim within thirty days of the decision being made.

Dated this 12th day of February, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge