IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Allen Siegfried, | ) | |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW, AND ORDER FOR** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| Bureau of Indian Affairs and | ) | Case No. 1:05-cv-055 |
| United States of America, | ) | |
| | ) | |
| Defendants. | ) | |

## PROCEDURAL HISTORY

Plaintiff Siegfried initiated this action on April 15, 2005, against the defendants Bureau of Indian Affairs ("BIA") and the United States (collectively the "government") pursuant to the Federal Tort Claims Act ("FTCA"). Siegfried seeks damages for injuries he sustained during a vehicle collision in April 2003 between a BIA law enforcement vehicle in which he was a passenger and a pickup stolen by Curtis Feather ("Feather").

At the time of the collision, Feather was being chased by tribal and BIA law enforcement officers. When the chase began, Siegfried, a tribal officer, was in a vehicle with another tribal officer, but he switched over to the BIA vehicle to assist with the chase as it proceeded at one point off-road. Siegfried's complaint sets forth two causes of action. The first is that the BIA was negligent in failing to properly maintain the passenger seat belt in the BIA vehicle. The second is that the government should be required to provide compensation under North Dakota's underinsured motorist laws given that Feather was uninsured. (Doc. No. 1).

On December 20, 2006, the government filed a Motion for Summary Judgment on the grounds that (1) this action was barred by the exclusive remedy provisions of the Federal Employees'

1

Compensation Act ("FECA"); (2) it was immune from suit; and (3) that the court lacked subject matter jurisdiction. (Doc. No. 10). The court granted the government's motion in part on February 12, 2009, concluding that Siegfried's claim for uninsured motorist benefits lacked merit. (Doc. No. 22). In addition, the court determined there was a substantial question with respect to FECA coverage and that FECA benefits would be Siegfried's exclusive remedy if the Secretary of Labor determined that he was eligible. As a consequence, the court ordered that the action be stayed to allow for the filing and consideration of a FECA claim by the Department of Labor. See also Siegfried v. B.I.A., 2007 WL 512876 (D.N.D. Feb. 12, 2007).

Several years of delay ensued while Siegfried was pursuing FECA coverage. During this period, the court entered several orders with respect to the continued stay of the action and the denial of second motion for summary judgment by the government. (Doc. Nos. 26, 28, 30, & 34). The court believed that at least part of the delay was due to bureaucratic bumbling by the Department of Labor.

The primary purpose of FECA is to provide worker's compensation coverage to federal employees who are injured on the job. However, there is also coverage under FECA for state and local law enforcement officers who are injured while assisting federal officers in the apprehension of persons committing federal crimes. Siegfried v. B.I.A., 2007 WL 512876 at *3. Eventually, the Department of Labor did rule on Siegfried's claim for FECA benefits and concluded, in part, that he was ineligible based upon its determination that he was not assisting in the prevention of a federal crime at the time of the accident, but rather was involved in the pursuit of Feather for having committed a local theft offense with federal law enforcement (*i.e.* the BIA) merely assisting in that effort. (Doc. No. 36-1). While that may not have been the conclusion this court would have reached, the determination of FECA coverage in this case was a matter reserved exclusively to the discretion of the Secretary of Labor and was not subject to judicial review. Siegfried v. B.I.A., 2007 WL 512876

2

at **3, 4-6 (detailing the evidence that would have supported a contrary conclusion and noting that the Secretary's decision is not subject to judicial review).

Because the government's exclusive-remedy FECA defense was necessarily premised upon there being coverage for a person in Siegfried's situation and based on the Department of Labor's determination that he was not eligible based on the facts of what had occurred, the court ordered that the stay be lifted and the case scheduled for trial. (Doc. Nos. 37 & 40).

On April 29, 2011, based upon a request from both parties, the court entered an order bifurcating the issues of liability and damages. (Doc. No. 46). On May 20, 2011, the court conducted a one day trial on the issue of the government's liability. What follows are the court's Findings of Fact, Conclusions of Law, and Order for Judgment.

## FINDINGS OF FACT

1.At all times material, plaintiff Allen Siegfried was a tribal law enforcement officer employed by the Standing Rock Sioux Tribe.

2.On the morning of April 18, 2003, Siegfried was riding with fellow tribal law enforcement officer Thomas DeLong in DeLong's patrol unit when they were advised by the Fort Yates Police Department that a pickup truck had been stolen near Shields, North Dakota. Shields is located just outside of the western boundary of the Standing Rock Sioux Indian Reservation. Siegfried and DeLong proceeded toward Shields and passed a pickup meeting the description of the stolen vehicle traveling in the opposite direction. They tried to stop the pickup truck near the junction of North Dakota Highways 24 and 1806, but were unsuccessful. The pickup truck fled north on Highway 1806 toward Cannonball, North Dakota, at a high rate of speed. Cannonball is located on the Reservation.

Siegfried and DeLong then pursued the stolen pickup truck at high rates of speed in and around the community of Cannonball. Eventually, the pickup went off-road down a big hill toward the Missouri River. Unable to pursue further in their patrol unit, Siegfried and DeLong stopped and were soon joined by BIA Special Agent David Lawrence ("Lawrence"), who had been dispatched to assist the tribal officers.

Lawrence asked Siegfried to join him in his four-wheel-drive patrol vehicle, a Ford Expedition, to assist in the pursuit off-road. They continued the chase, following the pickup down one embankment and up another. When Feather re-entered the roadway, Lawrence and Siegfried in the Ford Expedition were rejoined by DeLong in his vehicle. Also joining in the chase at that point were tribal officers Jeremy Hollow, Gary Sandland, and Shane Ramsey, as well as another BIA officer, Bryan Waukazoo.

After re-entering the roadway, the pickup driven by Feather broadsided Lawrence's patrol vehicle, striking it on the passenger side. After receiving radio confirmation that Lawrence's vehicle had been struck, BIA Chief Azure instructed Lawrence to attempt to run the pickup off the road before it re-entered Cannonball. Lawrence pulled his vehicle in front of the pickup and attempted a "rolling stop," but this maneuver was unsuccessful. The pickup collided with the rear of Lawrence's vehicle, striking it a second time. The chase continued after Feather was able to change direction.

Finally, Lawrence was again able to pull his vehicle in front of the stolen pickup and he attempted another "rolling stop." This time the pickup struck the rear of Lawrence's vehicle extremely hard. Upon contact, Siegfried claims that the upper portion of his torso was propelled

4

first backwards and then forwards, allegedly causing a severe lower back injury. Siegfried claims that the injury occurred as a result of a failure of the passenger seat belt to operate properly.

       3.      Siegfried acknowledges that he put his seat belt on when he first entered Lawrence's vehicle and that it latched into the "catch" or "receiver." Siegfried also acknowledges that the seat belt remained latched during the collision and that the lap portion of the restraint tightened following impact. What Siegfried claims malfunctioned was the shoulder strap portion of the restraint. His contention is that it did not sufficiently restrain him as he was propelled forward, although he acknowledges that he did not strike the front dash or collide with any other portion of the interior of the vehicle.

       4.      The only proof that Siegfried offered with respect to the failure of the seat belt was: (a) his testimony that he was propelled forward to what he claimed was a significant distance, but not so far as to strike any portion of the interior of the vehicle; (b) the evidence that he sought medical care immediately following the collision and was eventually diagnosed with having suffered a severe lower back injury, even though the initial treatment was for a cervical sprain; (c) his testimony that he was advised by Lawrence early in the chase that he should hold on because the passenger seat belt was not working; and (d) Lawrence's reference in his post-chase investigation report that Siegfried's seat belt had engaged during the collision, which Siegfried contends was out-of-place for an investigation report and suggestive of Lawrence trying to cover up for the fact that he had been operating a vehicle with an inoperative seat belt that led to an injury.[1]

---

[1] Siegfried was the sole witness called to testify on his behalf. The only other evidence that Siegfried presented were exhibits, which included reports from other officers involved in the chase. Only Lawrence's report mentioned the seat belt, and the report stated that it had engaged as Siegfried was propelled forward.

5.      Siegfried's account was directly contradicted by Special Agent Lawrence who appeared and testified upon behalf of the government. Lawrence testified that the passenger seat belt in his government-owned Ford Expedition was working at the time of the accident. He testified that he observed the shoulder strap restrain Siegfried as he was propelled forward some four to five inches, stopping Siegfried from hitting the front dash. He denied telling Siegfried during the chase to hold on because the seat belt was not working. He also testified that, as far as he knew, there never had been a malfunction with the seat belt either prior to or after the accident and that no repairs had ever been made to the seat belt. To corroborate Lawrence's testimony, the government introduced the post-accident repair invoice for the Ford Expedition, which reflected no seat belt repairs or replacements.

6.      Even if the court credited all of the evidence presented by Siegfried, it would not have been enough to establish that the seat belt failed to operate properly at the time of the final collision. This is because Siegfried acknowledged that the seat belt latched when he put it on, that it remained latched during the collision, and that he did not strike any portion of the interior of the vehicle when he was propelled forward. Under these circumstances, the mere fact that he was propelled forward without hitting the dash is not enough to prove that the seat belt failed without expert testimony to establish how the seat belt should have functioned and that what happened here was a malfunction.     The additional fact that Siegfried may have suffered a lower back injury also is not enough. For that to be of significance, there would have to be expert testimony to the effect that a properly operating seat belt should have prevented such an injury.

Finally, the evidence that Lawrence told him that the seat belt was not operating, even if true, was too vague in terms of what might have been wrong and whether it had anything to do with the

alleged failure of the seatbelt in this case.  For example, if by saying that the seat belt was not working, Lawrence had been referring to prior difficulties in getting the seat belt to latch, such a statement would have been irrelevant to the circumstances of this case, since the latch operated in this instance.

In summary, without expert testimony, Siegfried failed to prove that the seat belt malfunctioned on the day of the accident.  That being said, Siegfried's retention of an expert would likely have been unavailing for the reasons discussed next.

7. The government presented evidence from a professor of mechanical engineering from North Dakota State University with expertise in the operation of safety restraints.  There were two points about his testimony that the court found to be particularly persuasive.

First, he explained that passenger-vehicle safety restraints are purposely designed to allow the upper portion of the torso to move forward some distance, for the purpose of dissipating the forces exerted on the body, but not so far as to result in a collision with any portion of the interior of the vehicle.  Thus, the mere fact that Siegfried's upper torso was propelled forward during the accident and was not tightly restrained to the seat was not a malfunction.

Second, he explained that Siegfried's acknowledgment in his deposition testimony that the lap portion of the seat belt tightened during the collision is proof that the seat belt engaged and operated normally at the time of the accident.  He explained that the restraining strap over the shoulder and across the waist is one continuous strap or system.  If the lap portion of the strap tightened during the collision, meaning that the seat belt engaged as a result of the forces being

imposed, it would have been physically impossible for the shoulder portion of the strap to not also have tightened and functioned as a restraint.[2]

While the burden was upon Siegfried to prove that the seat belt malfunctioned as a necessary predicate to ultimately proving negligence, the court finds that the government proved by at least a preponderance of the evidence that the seat belt did not fail, based on the expert testimony it presented coupled with Siegfried's acknowledgment that the seat belt latched and later tightened around his waist at the time of the collision.

8. Given the failure on the part of Siegfried to prove that the seat belt failed, the court need not decide whether the government had sufficient notice of the alleged defect in the seatbelt and whether continued use of the vehicle would have been unreasonable.

9. Also, while not necessary for the court's ultimate conclusion, the court makes the further finding for purposes of any appeal that Siegfried failed to prove by a preponderance of the evidence that Lawrence made the remark attributed to him about the seat belt not working.

## CONCLUSIONS OF LAW

Based on the court's findings of fact, the court concludes that Siegfried failed to prove by a preponderance of the evidence that the government was negligent, which finding is necessary in order to hold the government liable under the FTCA. E.g., Laird v. Nelms, 406 U.S. 797, 798-799 (1972) (government only liable under the FTCA if it was negligent); see 28 U.S.C. §§ 1346(b)(1).

---

[2] The government's expert also conducted a forensic examination of the subject seat belt and found one "load mark," which suggested to him that there most likely had been only one prior occasion in which the seat belt had become engaged under forceful enough conditions to leave such a mark. He also testified that the magnitude of the collision in this case was sufficient to leave a "load mark" and that, if the "load mark" he found was created by the collision, it was proof that the seat belt had operated properly. While this part of the expert's opinion was corroborative, it was not conclusive proof that the seat belt operated properly at the time of the accident because the government could not eliminate the possibility that the single load mark had been created by some other event due to the fact that the government's knowledge of the history of the vehicle was not all encompassing.

## **ORDER FOR JUDGMENT**

Based on the foregoing findings of fact and conclusions of law and the court's earlier order granting partial summary judgment in favor of the government, it is hereby **ORDERED** that Siegfried's complaint be **DISMISSED WITH PREJUDICE**.

Dated this 13th day of May, 2011.

>                             */s/  Charles S.  Miller, Jr.*
>                             Charles S.  Miller, Jr.
>                             United States Magistrate Judge